Case 4:23-cv-02639   Document 44   Filed on 10/16/25 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
October 16, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MARIA ROBLES, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:23-CV-02639 |
| § | |
| AMGUARD INSURANCE COMPANY, § | |
| § | |
| Defendant. § | |

## ORDER

Pending before this Court is Defendant's Motion for Summary Judgment (Doc. No. 20), Plaintiff's Opposition (Doc. No. 21),[1] and Defendant's Reply in Support (Doc. No. 22). Having reviewed these documents, the record, and the applicable law, the Court hereby GRANTS Defendant's Motion for Summary Judgment. (Doc. No. 20).

### BACKGROUND

This is an insurance dispute. Defendant AmGUARD Insurance Company ("Defendant") issued the homeowner's insurance policy that covered Plaintiff Maria Robles' ("Plaintiff") home at all relevant times. The policy included Coverage A (Dwelling), Coverage C (Personal Property), and Coverage D (Loss of Use), with other relevant provisions including Homeowners 3 – Special Form, Special Provisions – Texas, and Personal Property Replacement Cost Loss Settlement – Texas.

---

[1] The Court acknowledges Defendant's arguments that Plaintiff's Response was untimely and contained Rule 56 deficiencies. (Doc. No. 22 at 2). For the purposes of this Order, the Court will consider Plaintiff's Response.

Plaintiff reported a claim to Defendant that on February 17, 2021, pipes burst in her home due to Winter Storm Uri, causing water damage throughout the property. On February 24, 2021, Defendant hired Pilot Catastrophe Services, Inc. ("Pilot") to inspect Plaintiff's property. The Pilot Final Report estimated a net claim of $11,886.09. (Doc. No. 20-4 at 2). On May 30, 2021, Pilot completed a supplemental report on Plaintiff's damages, increasing the net claim estimate to $20,901.31 after uncovering more damage when Plaintiff's contractor started repairs. (Doc. No. 20-8 at 3). As a result, Defendant initially paid Plaintiff $23,218.60 after factoring in depreciation and the Policy's deductible. (Doc. No. 20-12 at 21).

On June 24, 2021, Defendant received Plaintiff's contractor estimate from Royalty Homes & Construction for $61,429.50. (Doc. No. 20-5 at 3). On July 29, 2021, Defendant issued payments, less prior payments, depreciation, and deductible, totaling $38,046.27, bringing the total claim payments to $63,685. (Doc. No. 20-12 at 21); (Doc. No. 20-3 at 6).[2] Following this payment, Plaintiff called Defendant around nine times, requesting to speak with someone about her claim. (Doc. No. 20-3 at 5–6). Plaintiff also emailed Defendant multiple times seeking assistance. (Doc. No. 21-4 at 1).

On December 16, 2021, the Dick Law Firm ("DLF") sent Defendant a letter of representation on Plaintiff's behalf. (Doc. No. 20-6 at 2). Defendant then requested to reinspect the property but was informed by DLF that the property had been sold. (Doc. No. 20-9 at 2). Per

---

[2] Plaintiff requests that the Court strike Defendant's Exhibit 3 under Rule 37(c)(1) because Defendant attached an unredacted version of "claim notes" to its Motion despite only producing a redacted version during discovery. (Doc. No. 20-3) (AmGUARD's Claim Notes); Fed. R. Civ. P. 37(c)(1) (if a party fails to provide information in discovery, "the party is not allowed to use that information or witness to supply evidence on a motion . . . , unless the failure was substantially justified or *is harmless*." (emphasis added)). The Court agrees with Defendant that the failure here is harmless – Plaintiff's cited sections of the "claim notes" appear in both the redacted and unredacted versions, and Plaintiff does not identify any witnesses or evidence that she was prevented from pursuing because of Defendant's failure. Thus, the Court will consider Exhibit 3 for the purpose of this Order.

2

Plaintiff's "Seller's Disclosure Notice," she stated that the property sustained "freeze damage due to busted pipes. Home restored 100%." (Doc. No. 20-13 at 26).

In January 2022, Defendant requested additional documents to establish costs actually incurred by Plaintiff for repairs pursuant to the Policy's terms and conditions. (Doc. No. 20-7). In response, Plaintiff sent Defendant a rebuilding estimate from Quantum Claims Consulting Services ("QCC Estimate") totaling $321,781.45. (Doc. No. 20-10). Defendant then again requested documentation of the actual costs of repairs, including invoices, payment receipts, and copies of checks to support Plaintiff's estimated damages. (Doc. No. 20-7). Finally, on March 15, 2022, Defendant received a "Demand Letter and Invocation of Appraisal" from Plaintiff's counsel alleging $321,781.45 in damages and $10,000 in attorney's fees and cost. (Doc. No. 20-11 at 2). In the letter, Plaintiff demanded that Defendant participate in appraisal and stated that, if Defendant did not, Plaintiff fully intended to file a lawsuit forcing Defendant to participate. (Doc. No. 20-11 at 5). Defendant did not conduct an appraisal after learning that they could not inspect the property or confirm the damages because the property had been repaired and sold. (Doc. No. 8 at ¶ 9).

Thereafter, Plaintiff filed suit against Defendant in state court for: (1) breach and anticipatory breach of contract, (2) breach of the duty of good faith and fair dealing, (3) violations of the Texas Deceptive Trade Practices Act §17.46(a) and (b); (4) violations of the Texas Prompt Payment of Claims Act, TEX. INS. CODE. § 542.051-542.061; (5) unfair insurance practices under TEX. INS. CODE Chapter 541; (6) fraud; and (7) ongoing conspiracy to commit illegal acts. Defendant then removed the case to this Court based on diversity jurisdiction. (Doc. No. 1). Plaintiff proceeded to file a Motion to Compel Appraisal and Abatement. (Doc. No. 7). In response, Defendant informed the Court that repairs to the property were complete, and the property had been sold. (Doc. No. 8). Further, Defendant argued that nothing in the Policy or law supported an

3

appraisal based on just photos of the property. (Doc. No. 8 at 4). Accordingly, this Court denied Plaintiff's Motion to Compel Appraisal and Abatement since these factors undermined "the purpose and intention behind the appraisal process." (Doc. No. 14). Defendant now seeks summary judgment, contending that each of Plaintiff's claims lack evidence and fail as a matter of law.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

Defendant moves for judgment on all of Plaintiff's claims. First, Defendant argues that Plaintiff materially breached conditions precedent to coverage by not providing requested documentation and cooperating with Defendant's investigation into Plaintiff's claim, resulting in the forfeiture of coverage or excusing Defendant's refusal to pay additional amounts. Second, Defendant argues that Plaintiff's extra-contractual, mental anguish, fraud, and conspiracy claims generally lack evidence and fail as a matter of law.

### A. Breach of Contract

#### *1. Does Plaintiff's Property Repair Claim Fail?*

Plaintiff claims that Defendant breached the Policy by failing to adequately compensate her for the damage caused to her home by Winter Storm Uri. Defendant argues that it is entitled to summary judgment on this claim because it has already paid the claim, and Plaintiff materially breached the conditions precedent to recover under the Policy for any additional sums.

As an initial matter, the Court finds that the Policy's Loss Settlement Provision controls since neither party disputes that repairs to the Plaintiff's property have been completed. Under the Policy, "[o]nce actual repair or replacement is complete," Defendant "will settle the loss" according to the Policy's "Loss settlement" provision, which states the following:

1. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
    a.    If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the least of the following amounts:
        (1)    The limit of liability under this policy that applies to the building;
        (2)    The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

>   (3) The necessary amount actually spent to repair or replace the damaged building.

(Doc. No. 20-2 at 36). The Policy further outlines Plaintiff's "Duties After Loss." (Doc. 20-2 at 36). Under the Policy, Plaintiff must do the following:

> C. Duties After Loss
>
> \*\*\*
>
> 4. Protect the property from further damage. If repairs to the property are required, you must:
>    a. Make reasonable and necessary repairs to protect the property; and
>    b. **Keep an accurate record of repair expenses;**
> 5. **Cooperate with us in the investigation of a claim;**
> 6. **Prepare an inventory of damaged personal property** showing the quantity, description, actual cash value and amount of loss. **Attach all bills, receipts and related documents that justify the figures in the inventory;**
> 7. As often as we reasonably require:
>    a. Show the damaged property;
>    b. **Provide us with records and documents we request** and permit us to make copies;

(Doc. 20-2 at 36) (emphasis added). If Plaintiff fails to comply with these duties and her failure prejudices Defendant, Defendant has "no duty to provide coverage." (*Id.*). The parties do not dispute that the Policy's "Duties After Loss" provision required Plaintiff to cooperate with the investigation into her claim and keep and provide documentation as requested. (Doc. No. 21 at 14). As a matter of law, Plaintiff was required to complete these duties under the Policy. If Plaintiff has incurred expenses above what Defendant already paid, then she must produce documentation showing what expenses she incurred.

The parties agree that Defendant paid Plaintiff a total of $63,685 for her claim. (Doc. No. 20-12 at 21); (Doc. No. 20-3 at 6). This payment was based on the initial estimates for Plaintiff's repairs, including Pilot's estimates (totaling $32,787.40), (Doc. Nos. 20-4, 20-8), and Plaintiff's contractor's estimate ($61,429.50), (Doc. No. 20-5 at 3). After receiving the DLF's letter of

representation and learning about the sale of the home, however, Defendant requested additional documents to establish costs actually incurred by Plaintiff for repairs. (Doc. No. 20 at 9). In response, Plaintiff provided a rebuilding estimate from Quantum Claims Consulting Services ("QCC Estimate") completed after the repairs were done, totaling $321,781.45. Considering this new estimate, Defendant then repeatedly requested documentation from Plaintiff regarding the actual cost of repairs to support Plaintiff's allegation that damages exceeded what Defendant paid. (Doc. No. 20-7).

It is undisputed that Plaintiff provided Defendant with only three invoices for work *actually* completed at the property – the Modern Plumbing Co., Inc. invoice ($261.70), the Infinity Electrical invoice ($3,685.00), and the Royalty Homes & Construction invoice ($61,429.50). (Doc. No. 20-14 at 8).[3] Notably, the total of these invoices, $65,376.20, closely mirrors Defendant's payment to Plaintiff of $63,685.[4] Plaintiff still has not provided Defendant with any documentation of actual costs of repairs beyond what Defendant already paid.

Plaintiff merely testifies in her "Unsworn Declaration" that she "cooperated with [Defendant's] investigation to the best of [her] ability and [] provided information and documentation as requested." (Doc. No. 21-5 at 2).[5] While Plaintiff contends that the provided

---

[3] Neither party cites to these invoices, and they do not appear to be in the record. Both parties, however, refer to them in their motions and, thus, the Court will treat the provided invoices as undisputed. *See* (Doc. No. 21 at 9–10); (Doc. No. 20 at 17).

[4] It is not clear whether payment of these three invoices was included in the payment Defendant made prior to the lawsuit being instigated.

[5] Defendant asserts that Plaintiff's affidavit, (Doc. No. 21-5), should be struck under the sham affidavit doctrine, Rule 26, and/or Rule 37. (Doc. No. 22 at 3). Under the sham affidavit doctrine, "a plaintiff may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). Here, Plaintiff's affidavit identifies entirely new personal property items, (Doc. No. 21-5 at ¶ 13), that conflict with the losses she previously provided in her initial inventory list during discovery. This, however, does not warrant striking the affidavit as it does nothing to create a genuine issue of material fact – these items merely add to the already-long list of alleged personal property losses. Further, even if

invoices listed above "do not reflect the full extent of losses," she points to *zero* documentation regarding further damage or repairs to her property. (Doc. No. 21 at 10). Plaintiff also simultaneously argues that "any delays in providing documentation were due to the overwhelming nature of this loss, [her] displacement from [her] home, and [Defendant's] own delays and poor communication." (*Id.*). She maintains that "this testimony alone creates a fact issue countering Defendant's claim of non-cooperation." (Doc. No. 21 at 14). The Court disagrees.

Plaintiff sent Defendant a demand letter alleging $321,781.45 in specific damages with only the QCC Estimate as back-up. Notably, the estimate was produced *after* the repairs were completed and Plaintiff's expert, Brandon Gadrow, testified that QCC only consulted photos reflecting the "finished work" and it did not have any material showing the property's condition before and after repairs were made. (Doc. No. 20-18 at 59:9–15). The QCC Estimate was just that – an estimate of what Plaintiff might have paid for repairs, not evidence regarding her actual costs. While Defendant repeatedly requested documentation from Plaintiff regarding her actual cost of repairs beyond what Defendant has already paid, Plaintiff failed to produce such documents throughout this litigation. Plaintiff, therefore, breached its obligations under the "Duties After Loss" provision of the Policy. (Doc. No. 20-2 at 40).[6]

---

the additional evidence fails to comply with Rule 26, that failure is harmless. Plaintiff still does not attach any documentation supporting these alleged losses and she, therefore, continues to fail the Policy's condition precedent to coverage. Because the affidavit does not "manufacture a genuine issue of material fact" or prejudice Defendant's claims and defenses, the Court will not strike Plaintiff's affidavit. *Dallas Indep. Sch. Dist.*, 220 F.3d at 386.

[6] It certainly seems quite reasonable that Defendant sought some back-up documentation. After all, Plaintiff was seeking over $300,000 for alleged work and she had not one bill or receipt to show for it. Moreover, before providing Defendant with any documentation, Plaintiff sold what she described as a 100% repaired property for $275,000, which, of course, includes the lot, (Doc. No. 20-13 at 14, 26), yet she seeks an additional $321,781.45 (based on her presuit demand), (Doc. No. 20-11), on top of the $63,685 that has already been paid.

8

Nevertheless, under Texas law, "[a]n insured's failure to cooperate will not operate to discharge the insurer's obligations under the policy unless the insurer is actually prejudiced or deprived of a valid defense by the actions of the insured." *Martinez v. ACCC Ins. Co.*, 343 S.W.3d 924, 930 (Tex. App.—Dallas 2011, no pet.); *cf. Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform.").

The Policy states that Defendant's payment for repairing damaged property will be the smallest of three metrics, one of which is the "necessary amount actually spent to repair or replace the damaged building." (Doc. No. 20-2 at 36). This provision protects Defendant from having to pay amounts that exceed the costs actually incurred by the insured. Since Plaintiff has failed to produce documents showing what she actually paid for covered repairs beyond what Defendant has already paid, Defendant cannot calculate the additional covered loss amount, if any. Plaintiff's failure to comply with her documentation duties is a material breach that prejudiced Defendant. *Clarendon Nat'l Ins. Co. v. FFE Transp. Servs., Inc.*, 176 F. App'x 559, 562 (5th Cir. 2006) ("The Texas Supreme Court has held that prejudice is the loss of a valuable right or benefit.") (citing *Hernandez*, 875 S.W.2d at 693); *Chesson v. Hall*, 2005 WL 2045570 at *25 (S.D. Tex. Aug. 25, 2005) ("A breach is material if the injured party does not receive the substantial benefit of the bargain.").

Defendant fulfilled its pre-suit obligations under the Policy but Plaintiff, however, failed to produce the documentation required under the Policy. The Court, therefore, grants summary

judgment to Defendant on Plaintiff's breach of contract claim based on an alleged failure to pay the property repair claim asserted here.[7]

### 2. Does Plaintiff's Personal Property Claim Fail?

Plaintiff further claims that Defendant breached the Policy by failing to adequately compensate her for the damage to her personal property in her home. Defendant argues that it is entitled to summary judgment on this claim because Plaintiff materially breached the conditions precedent to coverage by failing to submit a compliant, detailed inventory of her personal property items.

Under the Policy, Plaintiff was required to provide Defendant with a detailed inventory of "damaged personal property showing the quantity, description, actual cash value and amount of loss," including "all bills, receipts and related documents that justify the figures in the inventory." (Doc. No. 20-2 at 36) (Section I(C)(6)). Plaintiff was reminded of this duty in Defendant's payment letters to her stating that after repairs were completed, Plaintiff needed to "[s]end [Defendant] copies of [her] paid bills, cancelled checks and/or purchase receipts for the repairs to [her] home and/or the replacement of [her] personal property." (Doc. No. 20-12 at 3, 17, 20, 22).

Plaintiff argues that she "did her best to comply" with her duties by providing a contents list during the claim. (Doc. No. 20-15). In her "Unsworn Declaration," Plaintiff states that her initial list was incomplete and so she identifies several new categories of personal property that were "omitted or undercounted" in her initial inventory, including "a damaged cedar chest, additional clothing (undergarments) and pillows, and more extensive Christmas decorations than

---

[7] For the purposes of this Order, the Court does not discuss the admissibility of Mark West's declaration and report since they concern Plaintiff's QCC Estimate regarding the cost of repairs and such evidence is not relevant here because the Court determined Plaintiff committed a prior material breach excusing Defendant's failure to pay repairs.

10

first listed." (Doc. No. 21 at 15); (Doc. No. 21-5 at 2). Plaintiff argues that "any initial underestimation of contents was not an attempt to withhold information but rather a byproduct of the overwhelming task of cataloguing a houseful of damaged goods." (Doc. No. 21 at 15). Further, she states that she produced documentation of her personal property loss in discovery, "only to have Defendant ignore it." (Doc. No. 21 at 16).

Defendant argues that Plaintiff never produced "a compliant contents inventory" because her inventory lists never included the actual "bills, receipts, and related documents" justifying the figures in the inventory, as required under the Policy. (Doc. No. 20-2 at 36) (Section I(C)(6)). Despite this, Defendant paid Plaintiff an additional $10,442.52 for her contents claim. (Doc. No. 20-12 at 19). Regarding Plaintiff's additional items identified in her "Unsworn Declaration," Defendant argues that Plaintiff still offers no documentation supporting these contents and expenses. (Doc. No. 21-5 at 2).

Plaintiff claims she is owed $37,039.17 for her personal property but does not provide *any* "bills, receipts and related documents" justifying the claimed figure, as required under the Policy. (Doc. No. 20-2 at 36); (Doc. No. 20-15). Plaintiff, therefore, again breached her duties under the Policy.

As stated previously, this breach will not discharge Defendant's obligations under the Policy "unless the [Defendant] is actually prejudiced or deprived of a valid defense by the actions of the insured." *Martinez*, 343 S.W.3d at 930. Under the Policy, Defendant need not pay "more than the amount required to repair or replace" any personal property. (Doc. No. 20-2 at 36) (Section I(D)(1)). This provision protects Defendant from paying claims that might be inflated or overvalued. Plaintiff's breach here prevents Defendant from calculating the "actual amount required to repair or replace" any personal property, meaning Defendant cannot calculate the

11

additional covered loss amount, if any. (*Id.*). Plaintiff's failure to produce a compliant inventory list is a material breach that prejudiced Defendant.

Therefore, the Court grants summary judgment to Defendant on Plaintiff's breach of contract claim based on an alleged failure to pay for her personal property loss. Plaintiff's breach of contract claim must be dismissed.

## B. Extra-Contractual Claims

In addition to the breach of contract claim, Plaintiff's complaint also asserted breach of the duty of good faith and fair dealing and violations of the Deceptive Trade Practices Act ("DTPA") and the Texas Insurance Code. (Doc. No. 1-4 at 16–26).

*The "Bad Faith" Claims*

The Court first observes that Plaintiff's claims for violations of the DTPA, violations of Chapters 541 and 542 of the Texas Insurance Code, and breach of the duty of good faith and fair dealing, may be treated equally as "bad faith" claims. Texas courts have ruled that each of these three claims require the same predicate for recovery, such that evidentiary insufficiency is equally dispositive. *See Montoya v. State Farm Lloyds*, 2016 WL 7734650, at *3 (S.D. Tex. Sept. 12, 2016); *St. Luke's United Methodist Church v. Church Mut. Ins. Co.*, 2022 WL 980352, at *7 (S.D. Tex. Mar. 31, 2022); *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997) (observing that Texas courts have ruled that "these extra-contractual tort claims require the same predicate for recovery as bad faith causes of action in Texas"). As a result, "when an insured joins claims under the Texas Insurance Code and the DTPA with a bad faith claim asserting a wrongful denial or delay in the payment of policy benefits, if there is no merit to the bad faith claim, there can be no liability on the statutory claims." *Kondos v. Allstate Tex. Lloyds*, 2005 WL

1004720, at *13 (E.D. Tex. Apr. 25, 2005) (citing *Higginbotham*, 103 F.3d at 460); *see also Soto v. Lloyds*, 2016 WL 6883174, at *5 (S.D. Tex. Aug. 19, 2016).

Furthermore, Texas courts have held that an insured may not prevail on a "bad faith" claim without first proving the insurer breached the contract. *See USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 500 (Tex. 2018); *Liberty Nat. Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996); *Losciale v. State Farm Lloyds*, 2017 WL 3008642, at *2 (S.D. Tex. July 14, 2017). Thus, because the Court previously found that Defendant did not breach the contract, Plaintiff cannot prevail on her "bad faith" claims. Nevertheless, the Court will consider the extra-contractual claims more fully.

i. Bona Fide Dispute

A plaintiff may sue for breach of the duty of good faith and fair dealing if their insurer denies or delays their claim without any reasonable basis for the denial or delay in the processing of claims. *Blueitt v. Crestbrook Ins. Co.*, 643 F. Supp. 3d 651, 658 (N.D. Tex. 2022) (citing *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)). Nevertheless, courts have consistently held that a bona fide coverage dispute is not evidence of an insurer's unreasonableness. *Higginbotham*, 103 F.3d at 459; *see also Blueitt*, 643 F. Supp. 3d at 658. As such, an insurer is entitled to summary judgment on extra-contractual claims if the summary judgment evidence establishes that there was no more than a good faith dispute. *U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997). As mentioned previously, due to the close relationship between common law bad faith claims and the statutory bad faith provisions found in the Texas Insurance Code and the [DTPA], "Texas courts have held that the bona fide dispute rule also applies to statutory bad faith claims under the [DTPA] and the Texas Insurance Code." *Blueitt*, 643 F. Supp. 3d at 658 (citing *Higginbotham*, 103 F.3d at 459).

Here, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendant acted in bad faith. Plaintiff's evidence regarding these "bad faith" claims is minimal. First, regarding Plaintiff's claim of breach of the duty of good faith and fair dealing, Plaintiff merely cites to (1) her multiple calls and emails to Defendant, (Doc. Nos. 21-2, 21-3, 21-4), (2) her claim that Defendant "underpaid [her] claim relative to known estimates," and (3) her "Unsworn Declaration" that Defendant "tried to pressure the contractor to cut corners on price" as evidence. (Doc. No. 21 at 21); (Doc. No. 21-5 at 2). Plaintiff asserts that, based upon this evidence, "[a] reasonably jury could conclude that Defendant did not have a reasonable basis for its prolonged delay in fully paying the claim." (Doc. No. 21 at 21). Second, regarding Plaintiff's allegations under the Texas Insurance Code and the DTPA, Plaintiff explicitly states that "the same facts that support bad faith . . . constitute misrepresentations and/or failures to settle promptly" under the Texas Insurance Code. (Doc. No. 21 at 22).

Thus, the "bad faith" claims relate solely to Defendant's investigation and handling of Plaintiff's policy claim. As discussed above, the evidence proffered by Defendant demonstrates that the claim was denied/delayed because Plaintiff failed to cooperate with and produce documentation for Defendant's investigation into her claim. Defendant, therefore, established a reasonable basis for denying Plaintiff's further claims and this case involves a bona fide coverage dispute. As such, Defendant is entitled to summary judgment on Plaintiff's extracontractual claims.

    ii. Independent-Injury Rule

Under *Menchaca*, "[a]n insured cannot recover any damages based on an insurer's statutory violation unless the insured established a right to receive benefits under the policy or an injury independent of a right to benefits." 545 S.W.3d at 500. As the Court previously determined

Plaintiff did not have a right to receive benefits under the Policy, she must proceed using the independent-injury rule.

The Fifth Circuit has clarified that the Independent-Injury Rule "limits the recovery of *other* damages that 'flow' or 'stem' from a mere denial of policy benefits." *Lyda Swinerton Builders, Inc. v. Okla. Surety Co.*, 903 F.3d 435, 452 (5th Cir. 2018) (citing *Menchaca*, 545 S.W.3d at 500) ("We have further limited the natural range of injury by insisting that an injury is not 'independent' from the insured's right to receive policy benefits if the injury 'flows' or 'stems' from the denial of that right."). Even the Supreme Court of Texas seemingly recognized the narrow window imposed by the Independent-Injury Rule, stating that "although we reiterate . . . that such a claim could exist, we have no occasion to speculate what would constitute a recoverable independent injury." *Menchaca*, 545 S.W.3d at 500. The Court held that such a successful claim would be "rare, and [the Supreme Court of Texas] in fact had yet to encounter one." *Id.* at 499.

Plaintiff's alleged "mental anguish" damages do not constitute an "injury independent of a right to benefits." *Menchaca*, 545 S.W.3d at 500. In her "Unsworn Declaration," Plaintiff asserts that Defendant's "delay in properly handling [her] claim caused [her] significant stress and hardship." (Doc. No. 21-5 at 1). Further, she states that Defendant's improper handling of her claim caused her "significant mental anguish and emotional distress." (*Id.* at 2). That is the extent of Plaintiff's evidence. Under Texas law, to show an entitlement to mental anguish damages, a plaintiff must put on evidence showing "the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine" or showing "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Here, Plaintiff has produced no evidence establishing a "substantial disruption" in her routine or showing a "high degree of

mental pain and distress." *Id.* Plaintiff makes mere conclusory allegations offering no details or evidence to support her bare assertions of mental anguish. Thus, Plaintiff does not satisfy the independent-injury prong under *Menchaca*, and she cannot recover for her "bad faith" claims. 545 S.W.3d 479 at 500.

Accordingly, Plaintiff's claims for breach of the common-law duty of good faith and fair dealing and violations of the DTPA and Texas Insurance Code fail as a matter of law. *See Soto*, 2016 WL 6883174, at *5 ("[A]n insurer may establish its right to summary judgment by showing that there is 'no more than a good faith dispute' as to coverage.").

The Court grants summary judgment to Defendant on Plaintiff's claims for breach of the duty of good faith and fair dealing and violations of the DTPA and Texas Insurance Code.

### C. Fraud

Defendant contends Plaintiff fails to adequately plead a single fraudulent representation by Defendant. Plaintiff alleges in response that she has identified multiple misrepresentations by Defendant: "Defendant . . . repeatedly gave Plaintiff the impression that her claim was actively being handled by stating 'we are working on your claim,' or 'your claim is in process,'" (Doc. No. 21 at 27), and Defendant suggested "that the reason for the lack of further payment or action on the claim was Plaintiff's own inaction" (Doc. No. 21 at 27). Beyond these two instances, Plaintiff merely speculates on *potential* misrepresentations Defendant might have made. (Doc. No. 21 at 28).

The Federal Rules require a "particularity" requirement on "all averments of fraud or mistake." Fed. R. Civ. P. 9(b). To show "particularity" of the circumstances constituting fraud, the plaintiff must allege the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." *Benchmark*

16

*Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003). Here, Plaintiff fails to describe the "who, what, when, where, and how" of her alleged misrepresentations. *Id.* Conclusory allegations and mere speculations are insufficient.

Considering the pleadings, the Court grants Defendant's motion for summary judgment on Plaintiff's fraud claim.

### D. Conspiracy

Lastly, "[t]o establish a civil conspiracy, the plaintiff must show that the defendants agreed on a goal or course of action, and that one of them committed an unlawful, overt act in furtherance of the goal or course of action." *Ball v. United Parcel Serv., Inc.*, 2011 WL 1642148, at *2 (S.D. Tex. Apr. 29, 2011) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). Further, "since civil conspiracy is a derivative tort, the plaintiff must show that the defendants were liable for some underlying tort in order to prevail on this cause of action." *Id.* (citing *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 635 (Tex. 1997)). If the underlying tort claim fails, so too does the conspiracy claim.

Plaintiff's civil conspiracy claim here is based on the underlying tort claims discussed above: fraud, violations of the Texas Insurance Code and DTPA, and breach of the duty of good faith and fair dealing. Defendant argues that because civil conspiracy is a derivative claim and Plaintiff's underlying tort claims fail, Plaintiff's civil conspiracy claim fails as well. (Doc. No. 20 at 25–26). In response, Plaintiff argues that because she has provided sufficient evidence on the underlying claims discussed above, the underlying claims do not fail and "it follows that the conspiracy claim should be allowed to proceed in tandem." (Doc. No. 21 at 30). As for evidence of a conspiracy, Plaintiff alleges that Defendant's actions in handling her claim could be viewed

as "a conspiracy to deprive Plaintiff of entitled funds" and her injury from the underlying torts satisfies civil conspiracy's injury element. (Doc. No. 21 at 30–31). Therefore, Plaintiff argues, summary judgment on the conspiracy claim is unwarranted.

As discussed above, the Court finds that all of Plaintiff's underlying tort claims fail. Thus, Plaintiff cannot recover for its derivative tort of civil conspiracy. The Court grants Defendant's motion for summary judgment on Plaintiff's conspiracy claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment in its entirety. (Doc. No. 20). This matter is hereby dismissed with prejudice. A final judgment will issue separately.

Signed on this 16th day of October, 2025.

Andrew S. Hanen
United States District Judge